Good morning. May it please the Court. Kathleen Bollinger is disabled by a combination of her impairments, both mental and physical, including back pain, neck, feet, joint, headaches, weakness in her arms, fatigue, depression, and anxiety. She did what she could to remain a productive member of society, but the Commissioner used these efforts against her to find her not disabled. This case was briefed in detail, and I'd like to focus on just a couple of the errors, the first one being the evaluation of the mental impairment by the Administrative Law Judge. Here the Administrative Law Judge did recognize that there were severe mental impairments of depression and anxiety and a learning disorder. However, when he got to his assessment of the limitations, which is the residual functional capacity assessment, all he included was a limitation to following instructions, an ability to follow simple instructions. You said the mental limitation was severe, but did the medical evidence classify it as severe? I mean, they're not going to classify it, but what did they say that made it severe? Now, the severity step is the second step in the sequential evaluation process, and it's actually a very easy step to pass. The Administrative Law Judge just needs to find that it has a minimal effect on basic work activities. What the second step, the severity step, means is that the Administrative Law Judge recognized that these were medically determinable impairments that had been diagnosed by psychologists. Then the disability determination services consultant, one of the agency doctors, identified a number of moderate limitations that the Administrative Law Judge did not accept, and that is why it is a severe impairment that caused moderate limitations. Now, the Administrative Law Judge even acknowledged in the decision that they were moderate limitations. Some of these limitations were, for example, moderate difficulties in maintaining attention and concentration, moderate limitations in ability to complete a normal work day and work week without interruptions from psychologically based symptoms, moderate limitations in ability to perform at a consistent pace. This went on. Then the agency doctor then went on to say that because of these moderate limitations, the individual would have problems, would be able to perform some work as long as the tasks were repetitive. The Administrative Law Judge did not include that in his findings. That it would be a low-stress occupation, and that there would be an ability to interact with the general public, but only in a non-confrontative manner. And so the Administrative Law Judge recognized that there were these moderate limitations, but did not include these in the residual functional capacity finding that he presented to the vocational expert. Therefore, he didn't meet his Step 5 obligations. At Step 5, the Administrative Law Judge has the burden to show that there are other jobs that the individual can perform. Without presenting these functional limitations, there's no way that he would have known or that the vocational expert would have known to identify jobs that supported these. Is it your position, pardon me, Counsel, is it your position that the vocational expert was not put the right foundational questions? Yes, it is. And what foundational questions would you have him or her put? The foundational questions should have included these moderate limitations on interacting with the public and concentration and pace. And the types of jobs that were identified were jobs that very well may have involved pace. I'm not a vocational expert, so I can't say. But there were two jobs identified, an order clerk and an appointment clerk. It's our argument that the appointment clerk falls for other reasons, that it did not meet some of the agency's own regulations. The order clerk was a type of cashier, which involved working with the public. Now, the combination of physical impairments that Ms. Ballinger had, including her neck problems, her pain problems, the fact that her pain was exacerbated or that her mental impairments were exacerbated by pain, which is well-documented, none of that was included, neither were any pace problems with pace or persistence. You're not saying that the moderate limitations eliminated her completely from any interaction with the public at any time, are you? No. But what the vocational expert was not aware of, that there was some limitation with interaction with the public, and the vocational expert identified a position that involved interaction with the public. There are other problems with this job. The administrative law judge specifically found that there were problems with Ms. Ballinger's neck and did not take that into account at all in his residual functional capacity, finding that he presented to the vocational expert. Now, neck mobility certainly seems to be relevant to a cashiering position where one is leaning over and giving change and taking tickets and that kind of thing. So that was certainly one of the problems. The mental limitations were another problem. Now, Ms. Ballinger also talked about her neck problems radiating down into her arms, causing her to drop things and also to have problems lifting her arms. This was borne out by evidence that was submitted to the Appeals Council. None of this was included. Any objective medical evidence that she had an impairment in her spinal column which caused the radiation? There was evidence. Like an MRI? There was evidence, I believe, of, yes, of some disc problems. Now, I don't think that was developed. Can you give me a citation to the excerpt of record that shows some objective evidence of nerve root impairment resulting in radiopathy? I do not have that right now, but the administrative law judge did find that to be a medically determinable impairment. Therefore, it would be reasonable to believe that there would be some functional limitation. I can provide that on rebuttal, the citation on rebuttal. You have about three minutes left. I'd like to reserve those. That's fine. Okay. Now, Ms. Michelani. Good morning. Nancy Michelani for the Commissioner. May it please the Court. Your Honor, what I think I'll do is just go ahead and respond to what we were just discussing here. In the hypothetical that was posed to the vocational expert, the ALJ did include repetitive movement. He asked, he said, but I think realistically probably sedentary, maybe a little light, like 10 or 15 pounds occasionally, certainly not repetitively throughout her workday, but occasionally, I think. Then he included the other stand and walk, maybe 15, 20 minutes, the other physical limitations, and then I think there was a reading problem, better stay with fairly simple instructions, no long complicated schematics and books on how to do things. And that's at excerpt of Record 74. But I think that the position of the appellant is that the exact limitations of interaction with the public, low stress, and elimination of repetitive work were not put to the vocational expert by the administrative law judge. In those words, do you think that that makes a difference? No, I don't think it makes a difference. All of the psychological and the psychiatric reports showed that the plaintiff had only moderate limitations. Everything was moderate. She had they were all consistent in that she had a low-level dysphoria, chronic dysthymia, occasional depression when her back pain exacerbated. Everyone assigned her a GAF, global assessment of functioning, between 55 and 60. This is only moderate limitations. None of the reports suggest that plaintiff was unable to work because of psychiatric symptoms. Now, the plaintiff argued in her reply brief that Dr. Brown opined that employment was unlikely due to plaintiff's mood disorder. However, this misstates the evidence. At ER excerpt of Record 384, Dr. Brown stated, She does not appear to be suffering from a debilitating psychological condition. It would appear unlikely that she would be able to be employed under the current stand for any length of time. Now, Dr. Brown was clearly talking about physical problems, and Dr. Brown is a Ph.D. So here the AOD properly found that this opinion regarding employment due to physical impairments was beyond Dr. Brown's expertise as a psychologist. In further evidence that supports only moderate limitations other than all of the doctors being consistent with only moderate limitations, is that the ALJ noted that she attained an associate degree in accounting. She and, contrary to what plaintiff argues in her brief, that it took her 4 years to get that accounting degree, it took 3 years. Plaintiff began in the fall of 96, and that's at excerpt of Record 372, and she graduated in June of 99, and that's at 42. So that's a 3-year school term, which is not unusual. And she also, in the record, said that she had taken a quarter off. She ---- How much can we assume from college? Because, you know, you go and you sit for an hour and then your class is over and you can go do something else. What should we assume about her ability to work an 8-hour day? Well, Your Honor, in terms of whether or not she had psychological conditions that affected her is why I'm saying that she went to school. She attended school 5 days a week. She was there most of the day at school. She postponed her back surgery to finish school. It was recommended in March of 1999 that she have a second back surgery, but she postponed that back surgery so that she could finish school. And she did finish, and she graduated and got her degree. She stopped working in 1989 because her daughter was born and she wanted to stay home and raise her child. She wanted to be a stay-at-home full-time mother. And that's laudable, but it's not evidence of disability. Any social limitations were not supported by the evidence. Because of the fact, again, that she attended school 5 days a week and she had weekly contact, weekly social contact with her friends. And she filled out a questionnaire which stated this, and that's at 126. The psychological opinions from the Disability Determination Services Physicians, Drs. Hoke and Regits, in November of 98 and July of 99, both support the ALJ's findings. Their summary conclusions are at 422. They said she's able to understand, follow, and remember more than three-step verbally presented material. She's able to persist at simple and complex, over-learned, repetitive tasks for a minimum of two hours within a normal work shift. She could work with supervisors, coworkers, and would be most successful at low-stress occupations where she's able to interact with the general public in a non-confrontative manner. She's able to adapt to situations requiring independent functioning, manage money, provide for transportation, and care for independent living needs without assistance. So, clearly, any psychological problems that she had were very, very moderate, minor. They certainly didn't affect her in any way that she is unable to work. The ALJ's said that. The last report you read. I'm sorry. You just finished reading, and that was who was quoted? Those were the Disability Determination Services physicians, the DDS physicians. And that is at ER 420 and 422. All right. I'd like to talk, because I see my time is running down, talk about Step 5, that the ALJ made a proper Step 5 decision. When the VE testified that plaintiff had the basic skills to do the job of appointment in the DOT, the ALJ relied on and adopted the VE's opinion that she could perform this job even though it was semi-skilled. The ALJ isn't required to recite magic words. However, the ALJ did use the guidelines as a framework, as he has required, and found plaintiff not disabled under the rules. However, but because she was unable to perform the full range of sedentary work, he used vocational expert testimony for his findings. However, even if this Court decides that the issue of transferable skills was not properly addressed, and I believe that plaintiff may be addressing that in her rebuttal, this is harmless error, because there are 100,000 jobs nationwide as a food beverage cashier in the hotel industry at SBB 2 that the plaintiff can do the VE identified and the ALJ adopted that in his findings. So clearly the Commissioner has met her burden of establishing other work existing in significant numbers in the national economy that plaintiff can do. Your Honor, I'd like to address the evidence that was submitted to the Appeals Counsel. It does not provide a basis for changing the ALJ's decision. First of all, it consisted of a note written on a prescription pad by Dr. Cain, which is dated November 4th, 2001, which is seven months after the ALJ decision. And it doesn't relate back to the period prior to and on April 16th of 2001. The note states no lifting greater than 3 pounds and sit and stand for tolerance. The most that one could interpret from this note is that on that particular date and possibly for some unknown duration of time afterwards that she was supposed to follow those instructions. We have no idea why she went to see Dr. Cain, and that's the first time we see Dr. Cain in the record, by the way, is on this date. So we have no idea what this is about. We have no basis for the opinion. It's brief, conclusory, and it's unsupported by any clinical findings. Furthermore, and most importantly, there's no evidence that connects this note to the The second piece of evidence that was submitted to the Appeals Council is a two-page questionnaire from Dr. Feltz, which is dated March 18th, 2002, 11 months after the ALJ issued his decision. From the questionnaire, we can see that she was having some difficulty with her left arm, but the problem had not been diagnosed. And this is demonstrated in questions 2 and 3 where it says still being evaluated, and that's at 631. And contrary to plaintiff's claim that the doctor opined that she couldn't use her left arm for any lifting, question number 6 asked, how does this medical condition affect this person's ability to care for children? The answer provided says, unable to use left arm for any lifting. And of children would be the reasonable interpretation, since that's answering the question which was directly put as to how does it affect the person's ability to care for children. But it doesn't say any lifting of anything. Furthermore, it's brief, conclusory. It's unsupported by any clinical findings. And most importantly, it does not relate back to the time period, the relevant time period, which is prior to and on the date of the ALJ decision, which is April 16th, 2001. So that evidence ---- So please try to ---- please try to complete within a minute. Okay. Your time is concluded. So that evidence provides no basis for this Court to remand the case for further consideration. And, Your Honor, I can't ---- I'm going to stop now because I can't start something and finish it unless they're ---- We've got your briefs. Okay. And we've studied them all. Thank you. Thank you. And now we have rebuttal time for Ms. Chaka. Thank you. Dr. Rubenstein, at Excerpts of Record 540, saw Ms. Bollinger for left arm complaints. And his impression was left cervical radiculopathy, likely C7-based, so cervical vertebrae. He ordered X-rays, and they showed a loss of normal cervical lordosis and degenerative changes in the cervical spine. Yes, but the nerve conduction studies did not reveal any radicular symptoms. Excuse me? The nerve conduction studies did not reveal any radicular symptoms. No, I don't think they did. At ER 18 and 541. Right. Okay. There was also a Dr. Nels who diagnosed a C6 or C7 nerve irritation and probable residual nerve damage from two disc herniations involving ---- well, that was the lower ---- that was the S1 nerve root, so I guess, yes, C6 and C7. So the cervical spine nerve irritation. That was at Excerpts of Record 608. So those are two citations. The commissioner attempts to downplay the moderate limitations in mental functioning. However, an aspect that was consistent in the psychological evidence is that there was a relationship between the pain that Ms. Bollinger was feeling and her symptoms of mental impairments, and that there was an interrelationship when her pain increased, her symptoms increased. This was something that the administrative law judge was required to consider under Social Security ruling 96-7P, a psychological basis for the pain or the interrelationship between pain and physical symptoms. Now, saying that an individual is able to commit an ---- to complete an associate's degree in three years really has nothing to do with symptoms of depression and exacerbation of pain when the individual is taking three hours of classes a day, when that individual is able to take an hour break between classes and stand during classes and has a special chair. The individual ---- Ms. Bollinger really tried. She wanted to go back to work, and she thought that this accounting would be her career, and she did everything she could. When she put off that surgery, she put it off against her doctor's advice for just a little while, and he gave her some injections that basically got her through the end of her term. Two weeks after she finished her degree, she had that surgery. This is not an individual who, as VALJ said, can be where she wants to be if she wishes to be. This was not an example of malingering. This was an individual who powered through some serious pain in order to try to find work. The jobs that the vocational expert identified are not the kinds of jobs that she could perform. Thank you. Thank you very much. We appreciate your argument. Fine arguments on both sides. And Bollinger v. Barnard shall be submitted. Thank you both. The next case on our docket is United States v.
judges: Canby, Gould, Bea